Meade A. CARPENTER, Jr.,
Plaintiff-Appellee,

v.

UNITED STATES of America,
Defendant-Appellant.

No. 73–1420.

United States Court of Appeals,
Fifth Circuit.

June 3, 1974.

Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks, Atty., Tax Div., U. S. Dept. of Justice, Washington, D. C., Frank D. McCown, U. S. Atty., Fort Worth, Tex., D. Wendell Barnett, Gordon S. Gilman, Tax Div., Dept. of Justice, Dallas, Tex., Ernest J. Brown, Atty., Tax Div., Dept. of Justice, Washington, D. C., for defendant-appellant.

Michael L. Cook, Austin, Tex., for plaintiff-appellee.

Before WISDOM, COLEMAN and SIMPSON, Circuit Judges.

SIMPSON, Circuit Judge:

We review a judgment below for the taxpayer in an income tax refund suit. The taxes were paid after the Commissioner of Internal Revenue assessed a deficiency for the calendar year 1964. Carpenter v. United States, N.D.Tex. 1972, 348 F.Supp. 179. Upon our finding that the district court incorrectly determined taxpayer to have been a resident of a foreign country for the period in question, we reverse.

### THE FACTS

Meade A. Carpenter, Jr., the appellee, is a retired petroleum engineer. He spent a major portion of the years from 1954 through 1964 working in the Middle East at various jobs related to the petroleum industry. Relevant to our inquiry here is taxpayer's move to Saudi Arabia in 1958 when he assumed a position with the Saudi Arabian Ministry of Petroleum, under the leadership of Minister Abdullah H. Tariki. Taxpayer remained in this position until June 1962 when, he terminated his employment and departed for the United States with intermediate stops in Beirut, Lebanon, Switzerland, and Denmark. He was apparently motivated by dissatisfaction with the existing political situation in Saudi Arabia.

Prior to leaving Saudi Arabia, in April 1962, taxpayer and Minister Tariki entered into an oral agreement to form a partnership whose business was to be acting as petroleum consultants for the governments of the various petroleum producing countries in the Middle East and elsewhere. By the terms of this agreement, taxpayer was expected to spend at least six months in the United States before returning to the Middle East. Tariki enjoyed contacts with persons favorably placed with the governments of the oil producing nations. During Carpenter's visit to the United States the plan was for Tariki to lay the groundwork for the commencement of the partnership operation, by soliciting business for the venture with his governmental contacts. It was agreed that the headquarters for the partnership would be Beirut, Lebanon. Regarding taxpayer's anticipated date of departure for Lebanon, aside from providing for a six-month minimum stay in the United States, the agreement stated only that Tariki would contact the taxpayer "(o)nce the office had been established and we had enough work in the taxpayer's field to come back . . . ." (App. p. 44). As it developed, Tariki contacted the taxpayer during a visit to the United States in late January or early February 1963, and taxpayer joined Tariki in Lebanon on April 15, 1963. At that time the partnership was activated.

Taxpayer terminated the agreement with Tariki in November 1963 because of political disagreements between them. Taxpayer returned to the United States on December 1, 1963. On January 4, 1964, he returned to the Middle East to Kuwait, where he worked in a petroleum consulting capacity until August 10, 1964. Taxpayer returned to the United States permanently on that date.

The partnership with Tariki was never financially successful, and generated no amounts which taxpayer could ex-

clude from his 1963 income. However, taxpayer, who filed his income tax returns on a calendar year basis, did exclude from his 1964 income some $7400 representing earned income and allowances attributable to his employment in Kuwait that year. This exclusion was necessarily predicated upon the assumption that taxpayer had been a bona fide resident of a foreign country for an uninterrupted period including an entire taxable year. Internal Revenue Code of 1954, Sec. 911(a)(1), Title 26, U.S.C., Sec. 911(a)(1),[1] Taxpayer was obviously not a foreign resident for the entire year 1964. Thus, the validity of the exclusion depended in the first instance on taxpayer's ability to prove foreign residence for the entire year 1963. This was in turn dependent upon taxpayer's establishment of continued foreign *residence* during his ten month stay in the United States—June 1962 to April 1963. A secondary question is whether that foreign residence, if so established, continued uninterrupted through August, 1964.

The Commissioner determined that taxpayer had not been a bona fide resident of a foreign country for the entire year 1963 and assessed a deficiency for the 1964 tax year. Taxpayer paid the deficiency and timely instituted a suit for refund in the district court below. It is from the district court judgment granting the refund that the Commissioner appeals.

The threshold issue is whether the taxpayer successfully maintained his status as foreign resident during the period of his ten month absence from the Middle East, June 1962 to April 1963. That issue is a legal, not a factual one,

United States v. Winthrop, 5 Cir. 1969, 417 F.2d 905, 910, and cases there cited. The underlying facts are not in dispute. The conclusion to be drawn from the undisputed facts is thus a question of law. Winthrop, supra at p. 910.

## THE STATUTORY PROVISIONS

Under Code Sec. 911(a)(1), supra, a taxpayer must be a bona fide resident of a foreign country for an uninterrupted period including an entire taxable year before being entitled to exclude from income for tax purposes amounts earned from sources outside the United States during the period of absence. The Regulations, Sec. 1.911–2(a)(2), provide that the test of bona fide residence in a foreign country is, to the extent feasible, to be the test of alien residence established in Sec. 871 of the Internal Revenue Code, Title 26, U.S.C. Sec. 871, and the Regulations thereunder. But the Regulations, Sec. 1.871–2(b), defining residence, speak primarily to the situation of uninterrupted periods of presence by an alien in the United States. It is not challenged that taxpayer was a bona fide resident of Saudi Arabia until the time of his departure for the United States in June 1962. Regulations Sec. 1.911–2(a)(2) apply to the question of absence from a foreign country in which one has established residence, and provide in pertinent part:

> Though the period of bona fide foreign residence must be continuous and uninterrupted, once bona fide residence in a foreign country or countries has been established, temporary visits to the United States or elsewhere on vacation or business trips will not necessarily deprive the citizen

[1] Section 911(a)(1) provides in pertinent part:

Earned Income from Sources without the United States.

(a) General rule.—The following items shall not be included in gross income and shall be exempt from taxation under this subtitle:

(1) Bona Fide Resident of Foreign Country.—In the case of an individual citizen of the United States, who establishes to

the satisfaction of the Secretary or his delegate that he has been a bona fide resident of a foreign country or countries for an uninterrupted period which includes an entire taxable year, amounts received from sources without the United States (except amounts paid by the United States or any agency thereof) if such amounts constitute earned income . . . attributable to such period; * * *

of his status as bona fide resident of a foreign county.

Still unanswered, however, is the question that arises where, as here, the taxpayer terminates his residence in one foreign country and returns to the United States with the intent to leave the United States again but to live in a different foreign country: What showing must a taxpayer make in order to maintain his foreign residence for tax purposes during the hiatus in his stays abroad? [2]

## THE CASE LAW

Two reported cases are closely aligned with the taxpayer's from a factual standpoint: Leonard Larsen, 1955, 23 T.C. 599, and Robert A. Henningsen, 1956, 26 T.C. 528, aff'd 4 Cir. 1957, 243 F.2d 954. In *Larsen* the question before the Tax Court was whether the taxpayer had been a bona fide resident of Saudi Arabia for the calendar year 1949. The taxpayer had originally departed the United States on May 10, 1948, to begin work for International Bechtel, Inc. at a location in Saudi Arabia. Taxpayer took his first vacation some 18 months after arriving in Saudi Arabia. He left that country for the United States on November 28, 1949, and vacationed with his wife and her family in Massachusetts from November 30 to January 14, 1950, when he returned to Saudi Arabia.

In order to receive vacation travel pay to and from the United States, taxpayer was required (apparently by company policy) to terminate his existing employment contract with Bechtel before departing Saudi Arabia. More than a month prior to his departure, however, taxpayer had discussed with his superiors his return to work for Bechtel after

his vacation. As a result of this consultation, taxpayer's superiors lodged a request with Bechtel's main office in San Francisco that taxpayer be returned to Saudi Arabia upon the completion of his vacation. The request was granted, and taxpayer completed all necessary arrangements for his return before leaving for the United States. Although the opinion of the Tax Court is not specific to the point, we gather that these arrangements included some agreement as to the date when the taxpayer would return to his job in Saudi Arabia.[3] In addition, the taxpayer left all of his personal belongings in Saudi Arabia during the period of his vacation in the United States.

■ The Tax Court predicated its opinion that the taxpayer had been a bona fide resident of Saudi Arabia for the entire calendar year of 1949 on two grounds. First the court noted that the taxpayer had apparently determined to make a career of foreign employment, as evidenced by the fact that he had continued to be employed by Bechtel in foreign operations from 1948 through the time of the Tax Court proceedings in 1954. While we agree that a career pattern may constitute evidence to be considered in determining residence, it is certainly not dispositive of the question of residence during a given period of absence from foreign duty stations. The second ground relied upon by the Tax Court we find more worthy of note. The court stated:

> Although petitioner's first contract was technically terminated when he returned to the United States in November 1949, we are satisfied by the evidence that his visit to the United States at that time was merely a vaca-

---

**2.** The Government, in a letter submitted to the Court after the hearing of oral argument in this case, urges that Revenue Ruling 73–492, 1973–2 Cum.Bull. —— [1973–46 I. R.B. p. 14] recently issued by the Commissioner, be considered by the Court in deciding the instant case. While realizing the power of the Commissioner to apply his rulings retroactively, Dixon v. United States, 1965,

381 U.S. 68, 73–75, 85 S.Ct. 1301, 1304–1305, 14 L.Ed.2d 223, 227–229, we base our opinion on established case law and find recourse to Rev.Rul. 73–492 unnecessary.

**3.** This assumption as to *Larsen* is not crucial to our holding for reasons discussed more fully herein. See note 4–5 and accompanying text, infra.

tion, and that termination of the contract was simply a device for obtaining his transportation. It was in form but not in fact "terminal leave." It was understood when he left Saudi Arabia in November 1949 that he would return, and indeed he left most of his belongings there upon that expectation. 23 T.C. at 604.

We find the emphasis on the conditions actually surrounding the taxpayer's visit to the United States in 1949–50 more relevant to the determination of residence during that period than any statements about his general career pattern during years after the tax year in question. We further find it significant that taxpayer's stay in the United States was limited to approximately six weeks.

A different result was reached by the Tax Court in Robert A. Henningsen, 1956, 26 T.C. 528, aff'd, 4 Cir. 1957, 243 F.2d 954. The issue there was whether the taxpayer had been a bona fide resident of a foreign country for the entire calendar years 1946 and 1947. Taxpayer had left the United States to return to a position with a family-operated China Trade Act corporation in Shanghai, China. He had previously been employed by the company and resided in Shanghai from October 1929 until November 1941, when, pursuant to an agreement among the co-owners of the business because of the threat of hostilities in the Far East, he returned to the United States. The eventual outbreak of fighting prevented his return to Shanghai until February 1946.

In August 1947, some nineteen months after taxpayer's return to his job, he and his brother decided to sell their interest in the company to a brother-in-law, and terminate their own employment with the company. The agreement was put into effect in late 1947. Taxpayer and his brother about this time acquired the Coca-Cola bottling franchise for Hong Kong. They formed a corporation under the China Trade Act and began bottling operations in Hong Kong in late 1947. Taxpayer and his brother agreed for the brother to man-

age the bottling company until the volume of business justified taxpayer's assistance in management. Taxpayer left Shanghai in November 1947 and returned to the United States. Because this expected expansion did not eventuate the taxpayer never returned to Hong Kong to assist in the Coca-Cola business there. He continued to reside in the United States engaging in several business enterprises until the time of the Tax Court decision in 1956.

The taxpayer contended in the Tax Court alternatively (i) that he had continued to be a resident of China from October 1929 at least until the date of his return to the United States in 1947 or (ii) that he was a bona fide resident of China during 1947. Taxpayer's argument in support of the first contention was that he had intended throughout the duration of fighting in the Far East to return as soon as conditions would permit. In support of his claim of residence for the entire year 1947, taxpayer relied upon his intention formed before he left Shanghai in November 1947: to return to Hong Kong to assist in the management of the Coca-Cola business there. The Tax Court rejected both contentions.

Taxpayer's original departure from China in 1941 had been pursuant to an agreement among taxpayer, his brother, and brother-in-law that each would assume a tour of duty as sole manager in Shanghai until the political and military situation in the East stabilized. Taxpayer took the first tour, and was relieved by his brother in November 1941, at which time taxpayer departed for the United States. Regarding this departure and his subsequent stay in the United States, the Tax Court said:

Petitioner's return to this country was made pursuant to his agreement with Harkson and Anker (His brother-in-law and brother). His obvious intent at that time was to remain in the United States and, temporarily at least, make it his residence until it again became time ·for him to serve another tour of duty in China—appar-

ently some 2 years thereafter. Furthermore, it appears to be a fair inference that even this definite intent to return to China, after such necessarily extended stay in the United States, was abandoned after the outbreak of the war between Japan and the United States and replaced by a "mere floating intention indefinite as to time," to return to China if and when such war was brought to a successful conclusion by the United States and her allies. Thus, albeit petitioner's return to China was rendered impossible by the circumstances of war, nevertheless, as was aptly observed in Robert W. Seeley, supra [14 T.C. 175], at p. 182, "did he not then, from the time it was determined that conditions would not permit his return, fully intend to be a resident of the United States until those conditions were removed?" See also Marsman v. Commissioner [of Internal Revenue, 4 Cir.], 205 F.2d 335, modifying 18 T.C. 1. In our opinion, the facts here, as above outlined, admit of no answer to the quoted question other than in the affirmative.

26 T.C. at 535.

We think the Tax Court correctly emphasized the taxpayer's primary intent in November 1941 "to remain in the United States and . . . make it his residence until it again became time for him to serve another tour of duty in China . . ." as a factor to be considered in conjunction with the taxpayer's secondary intent to return to China according to the agreement with his brother and brother-in-law. We agree also that when the war rendered it impossible for taxpayer to fix the date certain of his return to China the intent to return changed from a "definite intent" into "a 'mere floating intention, indefinite as to time,' to return to China if and when such war was brought to a successful conclusion . . . ." To recapitulate, the combination of intent to remain in the United States, at least for the time being, coupled with the fact that the intent to return to China was indefinite as to time and contingent on circumstances beyond the power of the taxpayer to control were found by the Tax Court in *Henningsen* to be sufficient to overcome taxpayer's claim of bona fide foreign residency throughout the duration of the war.

The second arm of the taxpayer's argument in *Henningsen* was that he was a bona fide resident of China for the entire calendar year 1947, despite his departure for the United States in November of that year, because he intended to return to Hong Kong as soon as the Coca-Cola business grew to the extent that he was needed to assist in management of the business. In rejecting this contention, the Tax Court stated:

Albeit petitioner was a bona fide resident of China for a portion of 1947, the record does not disclose that he ever established a residence in Hong Kong. In fact, it appears that after his departure from China in 1947, he never was physically present in Hong Kong. He cites no authority and we know of none for the proposition that one may become a bona fide resident of a sovereignty different from that in which he has established such residence by a mere floating intention to do so in the indeterminate future.

26 T.C. at 536.

Significant here are Henningsen's failure to establish physical residence in Hong Kong before leaving the Orient, and the indefinite future date of his proposed departure for Hong Kong, the latter again being dependent upon development of the Coca-Cola business in Hong Kong, a contingency beyond Henningsen's ability to control, which instead hinged upon his brother's business enterprise. The fact of the taxpayer's failure to move to Hong Kong was relevant only insofar as the length of his absence from his claimed residence there was a factor to be weighed in deciding the bona fides of that residence. The Tax Court determined that the taxpayer's foreign earnings for the years 1946 and 1947 were not eligible for exclusion from his taxable income for those years.

In affirming, the Fourth Circuit relied extensively on the test of domestic residence under the analogue to current Code Sec. 871 and the Regulations thereunder, and stated the test of residence in the United States as follows:

(O)ne who comes to the United States for a purpose of such a nature that an extended stay may be necessary for its accomplishment, and to that end makes his home temporarily in the United States, becomes a resident, though it may be his intention at all times to return to his domicile abroad when the purpose for which he came has been consummated.

243 F.2d at 957.

## OUR DECISION

For purposes of the instant case, we think this statement should be expanded by positing a twofold test to be used in determining whether one, who has established a bona fide foreign residence, maintains or relinquishes that residence during the course of a visit to the United States. We limit application of our proposal to individuals whose trip to the United States punctuates a move from one foreign country to another or from one job within a given foreign country to another job within that same country.

As a first step it should be determined whether reliable indicia are present that taxpayer's return abroad is reasonably certain as to fact and as to time. Factors to be considered should include: (a) the extent of the taxpayer's preparations, prior to his return to the United States, for assuming his new employment position or for moving to his new residence; and (b) whether the taxpayer has fixed a date certain for his departure for his new job or residence. The application of these factors may well depend on the question whether the taxpayer is self-employed or employed by another. Where a taxpayer is employed by another, the existence of a specific job assignment, which the taxpayer has accepted prior to his return to the United States and which calls for his return to duty in a foreign country within a specific period of time would be strong evidence of continuing bona fide foreign residence. This was basically the situation in *Leonard Larsen*, supra.[4] In the case of a self-employed individual, maintenance of bona fide foreign residence would be indicated by: (i) proof of an agreement to begin a new business venture requiring the presence of the taxpayer in a foreign country on or before a date certain; (ii) proof that the taxpayer's departure from the United States is reasonably within the taxpayer's individual control and not contingent upon the efforts of another or the vicissitudes of war or other elements beyond the taxpayer's control; (iii) the establishment of residence in a different foreign country prior to return to the United States. The absence of these elements was crucial, we believe, to the outcome of the *Henningsen* case, supra.

The second step of our test requires consideration of the duration of the taxpayer's presence in the United States between stays abroad. Without attempting to fix a limit as to the length of the permissible stay in the United States, there is a point beyond which—even assuming the establishment of sufficient indicia of intent to depart the United States by a date certain—the sheer length of the stay in the United States would weigh heavily in favor of a finding of intent to reside in the United States overriding an intent to return to another country. This was a significant factor in *Henningsen,* supra, where the court implied that an intent to reside in the United States for a period of two years prior to the contemplated return abroad would outweigh the intent to re-

4. In some circumstances it might perhaps be possible for the new job or residence assignment either to be uncertain at the time of the taxpayer's return to the United States or to be flexible to a limited extent as to the date of his departure. We need not further address ourselves to the matter here.

turn abroad in determining residency. Conversely, the brief duration of the taxpayer's stay in the United States in *Larsen*, supra, weighed in favor of a finding of continued foreign residence.

Applying this two-step test—which we emphasize is no more than a distillation of the considerations underlying the previous decisions rendered by the Tax Court in *Henningsen* and *Larsen* almost twenty years ago—to the facts in the instant case, we conclude that the taxpayer failed to prove continued bona fide residence outside the United States for the period of his ten-month stay in this country from June 1962 to April 1963. In reaching this decision, we stress the following factors. First, despite the agreement with Tariki to enter into a petroleum consulting partnership there was no date certain set for taxpayer's return to the Middle East. The only provision of the agreement relating specifically to a date of return was that taxpayer's stay in the United States was to be six months at the minimum. Beyond that, the date on which taxpayer would join Tariki in Beirut was totally indefinite. In addition, the fixing of a date of ultimate return was largely removed from the taxpayer's control. The agreement with Tariki provided that the taxpayer was to return when Tariki was able to generate business which would necessitate the taxpayer's presence in Beirut. We are faced here with precisely the indefiniteness and contingency of plans which were fatal to the taxpayer's claim in *Henningsen*, supra. Also in common with Mr. Henningsen is taxpayer's failure to establish a physical residence in the location to which eventual departure was planned. In sum, taxpayer has failed totally to satisfy the criteria embodied in *Larsen* and *Henningsen* for continued maintenance of a bona fide

foreign residency during his sojourn in the United States. We find it unnecessary to consider the question whether, assuming arguendo such maintenance of residency had been established, the ten-month duration of taxpayer's stay in the United States was of such a length as to indicate an overriding intent to reside in the United States for the time being.

In formulating our test and in reaching our decision, we point out the opportunity for abuse inherent in taxpayer's position. The taxpayer urges that we adopt an essentially subjective test of the intent to return to a foreign land and therefrom find continued residence outside the United States.[5] Under such a test, the taxpayer in *Henningsen* would have been considered a resident of China for the entire period from November 1941 to 1950, at which time he alleged he abandoned his intent to participate actively in the Coca-Cola business in Hong Kong. During this eight-plus year period, Mr. Henningsen actually resided in China for some twenty months. See Leigh White, 1954, 22 T.C. 585. Nor is it possible to regulate the possibility of abuse by looking solely to the duration of the taxpayer's stay in the United States. Such an approach would logically require the creation of a presumption of residence in the United States after passage of some specified period of time, a Draconian measure we are unwilling to adopt.

We are aware also that the test derived by us from our analysis of *Henningsen* and *Larsen* may on occasion be an obstacle to the exercise of sound economic or business judgment in certain circumstances. In the Henningsen case and in the instant case, sound business judgment manifestly dictated that the taxpayer delay reporting for work until there was in fact some work to perform. Similarly, sound economic judgment

---

5. In addition to asserting the existence of an oral agreement to form a partnership agreement with Tariki—whose existence we do not doubt—the only substantive evidence offered of taxpayer's intent to return abroad was the fact that he remained unemployed during the term of his ten month stay in the United States. Considered in light of the fact that taxpayer received income from rentals and investments during the period of his stay, the fact of his unemployment is of no significance.

counselled against obtaining abroad a physical residence which would have to remain unoccupied while a dual residence was maintained in the United States for an indefinite period. But the problem, we think, is not that our decision hampers the exercise of sound economic and business judgment. It is simply that there exists a contingency in the taxpayer's plans. To the extent that such a contingency finds expression in the indefiniteness of the proposed date of departure from the United States, and in the reluctance of the taxpayer to take up work or physical residence abroad, it represents as a corollary an intention to reside in the United States for an indefinite period and precludes a finding of bona fide foreign residency during that period.

Finally, we do not overlook the taxpayer's argument that his claim of continued foreign residency during the entire year 1963 is consistent with instructions contained in the 1964 edition of U.S. Treasury Department Publication 54, "Tax Guide for U.S. Citizens Abroad," which provides at page 7:

> To preserve your status as a bona fide resident of a foreign country, you must have a clear intention of returning from such trips, without unreasonable delay, to your foreign residence or to a new bona fide residence in another foreign country.

We do not fault the Treasury Department for trying to provide guidelines for taxpayers confronted with the bewildering maze of our tax laws, and we sympathize with the taxpayer who in fact relies upon what he accepts as an authoritative interpretation of the laws and of the Treasury publications. But nonetheless it is for the Congress and the courts and not the Treasury to declaré the law applicable to a given situation. As the Ninth Circuit has observed: "Nor can an interpretation by taxpayers of the language used in government pamphlets act as an estoppel against the government, nor change the meaning of taxing statutes; . . . "

Adler v. Commissioner of Internal Revenue, 9 Cir. 1964, 330 F.2d 91, 93. United States v. Heffner, 4 Cir. 1969, 420 F.2d 809, cited by the taxpayer, concerned operating regulations of the IRS and is not apposite.

## CONCLUSION

We hold that the district court erred as a matter of law in finding taxpayer to have been a bona fide resident of a foreign country for the entire calendar year 1963. It follows that the court improperly granted taxpayer's claim for refund of taxes paid on his income earned in Kuwait during 1964.

The judgment appealed from is reversed and the case is remanded with instructions to the district court to enter final judgment for the appellant United States.

Reversed and remanded with instructions.

COLEMAN, Circuit Judge (concurring):

After oral argument and conference on this appeal, I was inclined to affirm the judgment of the District Court. This initial view was grounded on the language contained in the 1964 edition of U.S. Treasury Department Publication 54, page 7, "Tax Guide for U.S. Citizens Abroad", quoted in the opinion which Judge Simpson has authored for the Court. Without bothering to discuss the matter or to cite cases in the field, I have a strong feeling that in their dealings with the Government citizens ought to have a right to rely upon what the duly authorized agents of the Government tell them. Nevertheless, I agrèe entirely with the considerations advanced in Judge Simpson's penetrating analysis of the problem.

I agree to reverse because the language in Publication 54 refers to "a clear intention of returning". Such a clear intention is not reflected by this record. There was certainly an expectancy, but, as pointed out, the actual intention was contingent upon Mr. Tariki

establishing the office in Beirut with enough work to justify a return, as pointed out at page 177 of the opinion of the Court.

I concur in all respects.